19 A.3d 512

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Ronald GIBSON, Appellee.**

Supreme Court of Pennsylvania.

Submitted Nov. 8, 2010.

Decided May 12, 2011.

</div>

334

Hugh J. Burns, Jr., Philadelphia District Attorney's Office, Philadelphia, Amy Zapp, PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

James H. Moreno, Billy Horatio Nolas, Defender Association of Philadelphia, Philadelphia, for Ronald Gibson.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

338

Justice SAYLOR.

This capital post-conviction matter relates to Appellee's killing of a Philadelphia police officer, Frederick Dukes, and a bystander, Vernae Nixon, during a failed robbery attempt at a bar in Philadelphia. The underlying factual and procedural background is detailed in the Court's prior opinions in *Commonwealth v. Gibson*, 547 Pa. 71, 688 A.2d 1152 (1997) (*"Gibson I "*) (direct appeal), and *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110 (2008) (*"Gibson III "*) (post-conviction). After multiple remands, it now remains to address whether Appellee has met his burden to establish that the deficient stewardship of his trial counsel resulted in prejudice at the penalty hearing.[1]

In *Gibson III*, a divided Court credited the PCRA court's findings that trial-level counsel were derelict in failing to adequately investigate and present life-history and/or mental health mitigation evidence at the penalty phase of Appellee's trial. *See Gibson III*, 597 Pa. at 423–25, 951 A.2d at 1122–24.[2] The Court concluded, however, that the PCRA court should have resolved certain credibility questions that arose from apparent discrepancies between the penalty phase testimony and the PCRA evidence, and that it should also have included a "specific comparative evaluation concerning the mitigation case actually presented with that which Appell[ee] currently alleges should have been presented." *Id.* at 422, 951 A.2d at 1122. Accordingly, the Court remanded for further factual development and analysis.

1. The first remand was accomplished by *per curiam* order, which was filed with accompanying statements from several Justices. *See Commonwealth v. Gibson*, 596 Pa. 1, 940 A.2d 323 (2005) (*per curiam*) (*"Gibson II "*).

2. In several respects, *Gibson III* was a plurality opinion, as only three Justices supported the full reasoning contained in the salient portion of the opinion, that is, Part I. *See Gibson III*, 597 Pa. at 420–25, 951 A.2d at 1121–24 (Saylor, J., joined by Baer and Todd, JJ.). However, two concurring Justices "join[ed] the Majority's explanation why ... the remaining dispositive issue is *Strickland* prejudice." *Id.* at 465, 951 A.2d at 1148 (Castille, C.J., joined by McCaffery, J.) (footnote omitted).

In the proceedings on remand, the PCRA court considered a number of sources of information, including: statements provided to the police in the wake of the offense by Appellee and another individual, David Green, who had been with Appellee on the night in question; the transcripts of Appellee's October 1991 trial, which included Appellee's own guilt-phase testimony and that of all penalty-phase witnesses; the testimony of Appellee's mother, Joan Gibson, that had been provided at a PCRA hearing on April 10, 2006, after the first remand, *see Gibson III*, 597 Pa. at 416, 951 A.2d at 1118 (summarizing Mrs. Gibson's 2006 testimony); and a 1999 declaration by defense psychiatrist Dr. Lawson Bernstein. Additionally, the PCRA court conducted a three-day hearing from May 13 to 15, 2009, at which Appellee presented the testimony of several lay witnesses—most notably, his friend Derrick Hook, his former girlfriend Niema Williamson, his grandfather Lavesta Bryant, and his aunt Leora Johnson—as well as three expert witnesses, including Dr. Bernstein and another forensic psychiatrist, Dr. John O'Brien. The Commonwealth presented the report and testimony of its own mental health expert, Dr. Timothy Michals, in rebuttal.[3] Finally, the court considered a 1988 mental health evaluation performed by court-appointed psychologist Lawrence Byrne in connection with Appellee's prior arrest for drug possession, to which some of the post-conviction expert witnesses referred.

The witnesses credited by the PCRA court gave details of Appellee's upbringing in a rough neighborhood of Philadelphia. A fuller life history emerges from their testimony than was heard by the jury at the penalty phase. Appellee was the first child of Joan Gibson, who married Appellee's father, Ronald Gibson, Sr., at the age of 19, and became pregnant with Appellee shortly thereafter. The elder Mr. Gibson was an alcoholic and maintained a highly controlling attitude toward Mrs. Gibson, enforcing his will through threats and

---

**3.** The court disbelieved Appellee's expert in the field of pharmacology and toxicology, who had opined regarding Appellee's blood-alcohol content on the night in question. However, the court credited the testimony of Drs. Bernstein and O'Brien. Their testimony is discussed below, as is that of Dr. Michals.

violence directed at her. Some of the testimony indicated that he struck Mrs. Gibson while she was pregnant with Appellee. Ronald Gibson, Sr. eventually left the family when Appellee was 21 months old and never returned. Mrs. Gibson consumed alcohol while pregnant with Appellee, although there is no indication that Appellee suffered from fetal alcohol syndrome or any cognitive limitations as a result. *See* N.T., May 13, 2009, at 222–23, 293.

Mrs. Gibson used alcohol and marijuana in the home in Appellee's presence. After the elder Mr. Gibson's departure, Mrs. Gibson had a series of boyfriends who were violent and were also alcohol and drug abusers. Their substance abuse took place in Appellee's presence in the home while he was a minor. Furthermore, Appellee was disciplined by Mrs. Gibson with her hand and with belts and sticks, sometimes while she was heavily intoxicated. Appellee stated that, during some of these beatings, he wished he were dead, although he denied suicidal ideation and reported no history of suicide attempts. *See* Report of John S. O'Brien at 4, *reproduced in* Petitioner's Composite Exhibit II, at Tab 2 (O'Brien Report). Overall, Mrs. Gibson was unloving toward her children, and neglected them often, preferring to go out, "party," and drink alcohol with her friends, rather than stay home and care for her children.

Appellee lived with his mother and two younger siblings on the third floor of a house. His maternal grandparents and their other children (Appellee's aunts and uncles) lived on the floors below. They could hear when an altercation was taking place on the third floor, and would bring Appellee downstairs to stay with them on such occasions. Although Appellee's grandparents were alcoholics, they tried to provide a nurturing environment. Thus, Appellee preferred to be with them because they were kinder toward him than was Mrs. Gibson who, in any event, was often absent. Appellee's aunt, Leora Johnson, who lived on the first floor of the house, tried to attend to Appellee's needs when his mother was not at home. Appellee's grandfather, Lavesta Bryant, also cared for Appellee, but he was strict and would discipline Appellee by admin-

istering corporal punishment. According to Mr. Bryant, Appellee was amenable to discipline, and would never have to be warned twice not to misbehave. Indeed, Mrs. Gibson confirmed at the penalty phase that Appellee had no serious disciplinary problems while he was a minor. *See* N.T., Oct. 10, 1991, at 10.

As Appellee advanced in school, it became clear that he had academic gifts. He was admitted to Simon Gratz High School, a "magnet" school in Philadelphia. While there, he performed well on standardized achievement tests and graduated near the top of his class, having been elected class president by his peers. Thereafter, Appellee attended community college in Philadelphia for a year. He also held a clerical position with the Social Security Administration for approximately three years, beginning in his later high school years. Appellee fathered a daughter with his girlfriend, Niema Williamson, who testified at the penalty phase that Appellee was a good father.[4] During the 2009 post-conviction hearing, Ms. Williamson added that Appellee's father's absence from Appellee's life bothered him, and she described Appellee's escalating alcohol and drug use after graduating high school. *See* N.T., May 13, 2009, at 180–83.

Appellee eventually lost his college tuition benefits and was separated from his employment at the federal agency after being arrested in 1988, at age 19, for drug possession—an arrest that led to Mr. Byrne performing his mental health evaluation in connection with a court directive that Appellee be diverted to a substance-abuse rehabilitation program. Although that evaluation reflects Appellee's statement he had used alcohol and marijuana since age 17, testimony from other witnesses and Appellee's admissions to health experts indicate that he began drinking earlier, at age 14, and that his alcohol consumption increased over the years. Furthermore, notwithstanding that Appellee was doing well academically in high

4. Appellee apparently also had two other children with other women. *See* N.T., Oct. 10, 1991, at 18 (reflecting the testimony of Appellee's grandmother, Helen Bryant, that Appellee has three children and that he treats them and their mothers well).

school, by the time he was a senior he was also using cocaine and, shortly thereafter, began smoking "turbos," which are marijuana cigarettes laced with cocaine.

At some time in his late-teen years, Appellee began selling illegal drugs, at least in part as a means of supporting his drug and alcohol habit. He continued to operate as a drug dealer for several years before the homicides occurred in this case. During those years, Appellee regularly carried a .38–caliber weapon for protection, which he felt was necessary because he was selling thousands of dollars' worth of drugs each day. This lifestyle, involving the trafficking of significant quantities of drugs, as well as the regular consumption of drugs and alcohol, continued until Appellee committed the present homicides at age 22, although there is little indication in the record that Appellee had acted violently on any prior occasion.[5]

In addition to a fuller picture of Appellee's life history, a significant issue that arose in the proceedings on remand concerned his possible state of intoxication at the time of the offenses. *See Gibson II*, 596 Pa. at 1, 940 A.2d at 323 (remanding for a hearing on the ineffectiveness claim based on counsel's failure "to investigate and present evidence of Appell[ee]'s severe intoxication at the time of the murders, history of drug and alcohol abuse, and of his dysfunctional family life"). While the testimony is conflicting as to the amount of alcohol Appellee consumed in the hours leading up to the murders, it appears undisputed that he drank at least several shots of Southern Comfort (a type of liqueur) at Dooner's Bar, where he was socializing before he travelled to Woody's Playhouse Bar where the killings occurred. According to Derrick Hook, Appellee imbibed a 40–ounce bottle of beer early in the evening before Hook and Appellee walked to Dooner's, and then Appellee drank a half-bottle of champagne at Dooner's in addition to the shots of Southern Comfort. Further, there was testimony that Appellee may have tempo-

5. The only possible exception is that Appellee was evidently convicted of simple assault in 1987. *See, e.g.*, N.T., May 13, 2009, at 288–89.

rarily passed out at some point in the evening, either at a table at Dooner's or in the car on the way to Woody's.

Nevertheless, during the critical events at Woody's, Appellee was able to adapt to the rapidly unfolding events in a rational, goal-oriented, and physically-coordinated manner. After Appellee began struggling for his handgun with an off-duty bouncer who had been in the men's room at the back of the bar, *see Gibson III,* 597 Pa. at 409, 951 A.2d at 1114, Appellee's cohort, Gregory Tancemore, fired warning shots into the ceiling, causing the bar's patrons to duck onto the floor for cover. At this point, Appellee's gun dropped and the clip fell out. Appellee quickly retrieved the firearm, put the clip back in, and scrambled over the bodies of numerous patrons lying on the floor to make his way from the back of the bar to the front. Appellee then looked back and noticed Officer Dukes reaching for his weapon. In response, Appellee crouched down to avoid being shot, pulled the slide back on his gun, and fired three shots toward Officer Dukes—at least two of which struck their target—all while backing out of the bar. Appellee immediately fled the scene on foot and met up with Tancemore and Green in the latter's car.[6] He then rode to Green's residence and hid the .45–caliber pistol under Green's mattress in an apparent attempt to conceal evidence. During police questioning two days later, at trial nine months later, and during psychiatric testing 18 years later, Appellee's memory of the events at Woody's was intact, and was neither fragmented nor blacked-out as sometimes occurs for intervals of extreme intoxication.

With the above as background, the parties' experts in forensic psychiatry testified at the May 2009 hearing. Appellee's first expert, Dr. O'Brien, had submitted a report in November 2008 after interviewing Appellee at SCI–Greene and conducting a routine psychiatric evaluation, which includ-

6. In his trial testimony, Appellee denied having ridden in Green's car after the incident, but he did admit to disposing of his .38–caliber handgun by throwing it into a river. He said he did this because he knew a shooting had just taken place at Woody's and he did not want the police to find him in possession of a gun near the scene. *See* N.T., Oct. 7, 1991, at 131–32.

ed a cognitive capacity screening exam and a mental status exam (which, in turn, entailed an alcohol and substance abuse evaluation). *See* N.T., May 13, 2009, at 201–02. In preparing his report, Dr. O'Brien also consulted the 1988 mental health evaluation performed by Lawrence Byrne, police investigative materials and reports, the penalty phase transcript, affidavits regarding Appellee from family members, witnesses, and friends, and this Court's prior opinions in the present case. His diagnosis was alcohol and mixed substance abuse including cocaine, marijuana, and PCP (phencyclidine).

In his testimony, Dr. O'Brien repeated his diagnosis, stating that it was consistent with Mr. Byrne's 1988 diagnosis of "mild reactive paranoid and passive-aggressive features as well as alcohol and cocaine abuse." *Id.* at 216. Dr. O'Brien explained that Appellee was not alcohol "dependent," as there was no evidence that he ever experienced withdrawal symptoms, but that substance abuse was a separate category of behavior in which a person continues to use significant amounts of an agent in spite of its harmful effects on his functioning. *Id.* at 232–33; *accord* N.T., May 14, 2009, at 36–37 (testimony of Dr. Bernstein that substance abuse means "you are using the agent in a highly dysfunctional way with a number of adverse consequences"); *id.* at 91–92 (same). The witness also referenced a multi-generational pattern of alcohol abuse spanning at least three generations, starting with Appellee's grandparents, as supporting the concept that Appellee may have a genetic predisposition toward substance abuse. *See* N.T., May 13, 2009, at 209, 211. As regards specific mitigating factors, Dr. O'Brien articulated a general impression that there was some basis for the (e)(8) "catchall" mitigator predicated upon the dysfunctional family environment in which Appellee was raised. In this respect, Dr. O'Brien considered Appellee's childhood history to have involved parental neglect and physical abuse (as opposed to discipline) at the hands of his mother, albeit Appellee had consistently denied being abused. *See id.* at 218–19, 228–29. Dr. O'Brien also identified "interpersonal aggressiveness in the home that wasn't directed at the kids"— *i.e.*, presumably between Appellee's mother and her husband or boyfriends—as a factor contributing to the generally dys-

functional home environment during Appellee's childhood. *Id.* at 220.[7]

As for other possible mitigators, Dr. O'Brien found support in the record for the (e)(3) mitigating circumstance, which relates to a substantial impairment of the defendant's ability to "appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 42 Pa.C.S. § 9711(e)(3). Upon questioning by the Commonwealth, Dr. O'Brien clarified that Appellee could appreciate the criminality of his conduct, as indicated by his flight and concealment of evidence. *See* N.T., May 13, 2009, at 239–40, 242. Because subsection (e)(3) is phrased in the disjunctive, Dr. O'Brien felt that any substantial impairment in Appellee's ability to conform his conduct to the law's requirements had independent relevance. He concluded that Appellee's ability to conform was, indeed, substantially impaired, in light of evidence indicating that Appellee ingested a large quantity of alcohol on the night in question. Dr. O'Brien explained, in this respect, that alcohol

---

7. One salient paragraph of the report states as follows:

During the historical portion of the evaluation session, Mr. Gibson ... indicated that he was ... the oldest of three half siblings raised in a single parent household. He stated that he did not see much of his biological father during his childhood. He described his overall childhood experience as "O.K., I guess ... I grew up in the hood." He denied any childhood history of physical or sexual abuse, but described himself as having been subjected to physical discipline by his mother, during which he, at times, wished that he was dead. He also indicated that ... there was "not much in the household that was too positive." Mr. Gibson stated that he always enjoyed going to school and "liked school a lot." At the same time, he described a childhood characterized by limited positive parental attention and indicated that ... he and his half siblings "raised each other," stating that his father was "never around," and his mother "had a lot of different boy friends." Mr. Gibson described negative memories of childhood to include a variety of witnessed traumatic events, including what he described as a "murder on our front steps," when he was eleven or twelve years old. Even though he denied any childhood history of physical abuse, he described his mother as routinely beating him and his half siblings "for whatever," stating "my mother would come in drunk ... I don't know why." He stated that he tried to spend as much time as possible with his maternal grandmother, but indicated that in his opinion she was also an alcoholic, but was kinder to him and his half siblings than his mother was.

O'Brien Report at 4–5.

has a disinhibiting effect on users, causing them to act impulsively and use poor judgment and—with someone who is an alcohol abuser—can still leave the person capable of performing tasks requiring physical coordination. *See id.* at 282–83; *accord* N.T., May 14, 2009, at 108–10 (testimony of Dr. Bernstein). As applied here, Dr. O'Brien thought that such alcohol-induced disinhibition was a factor in Appellee's actions, *see* N.T., May 13, 2009, at 214, 227–28, 237–38, 242, 253, 276, 299, particularly because Appellee, armed with a loaded weapon, confronted someone much larger than himself and acted in an aggressive or belligerent manner that Dr. O'Brien felt was uncharacteristic of Appellee. *See id.* at 295; *cf.* N.T., May 14, 2009, at 46 (reflecting Dr. Bernstein's opinion that Appellee had "a marked propensity not to be violent"); *id.* at 135 (describing Appellee's behavior as "[d]isinhibited and atypical").

Finally, Dr. O'Brien opined that the evidence of Appellee's spiraling alcohol and substance abuse problem could support a finding that he was under the influence of extreme mental or emotional disturbance. *See* 42 Pa.C.S. § 9711(e)(2). Dr. O'Brien reasoned that Appellee's pattern of drug and alcohol use, starting from the time he was in school, had ultimately caused an "extreme disruption in his pathway," from being a high-achieving academic performer with gainful employment and some college-level education, to an habitual criminal engaged in regular drug trafficking and drug and alcohol abuse on the streets of Philadelphia. N.T., May 13, 2009, at 206; *see also id.* at 214–15, 228, 298. Dr. O'Brien explained that his opinion regarding the (e)(2) mitigator was not based upon Appellee's state of mind at the time of the killings, *see id.* at 287–88, but on his diagnosis pertaining to substance abuse, together with the "downward spiral or deterioration of his life." *Id.* at 207.

Appellee's second psychiatric expert was Dr. Lawson Bernstein. *See supra* note 3. Dr. Bernstein had interviewed and evaluated Appellee more than ten years earlier, and submitted a declaration in February 1999. *See generally Gibson III,* 597 Pa. at 423 n. 10, 951 A.2d at 1122 n. 10 (quoting Dr. Bernstein's declaration). His May 2009 testimony was similar to

that of Dr. O'Brien in terms of his emphasis on Appellee's abusive and neglectful home environment, stating that such an upbringing increases the risk of drug and alcohol and/or psychiatric problems as an adult, and that Appellee's deteriorating mental state and heavy drinking on the night in question substantially impaired his ability to conform to the law. *See* N.T., May 14, 2009, at 44–45. Dr. Bernstein also expressed that Appellee's chaotic home environment could support the (e)(2) emotional- or mental-disturbance mitigator in addition to the catchall mitigator. *See id.* at 23–24, 63. Moreover, he developed that some of the 1999 PCRA defense affidavits recounted that Appellee had mood swings and opined, accordingly, that, at the time of the offense, Appellee may have been suffering from an organic impairment or secondary mood or personality disorder resulting from the effects of the drugs and alcohol on the brain's neurotransmitters. *See id.* at 47–48, 125–27, 131.[8] Notably, however, Dr. Bernstein conceded that his evaluation of Appellee's behavior at Woody's as it relates to the (e)(2) and (e)(3) mitigators depended on the assumption that he was heavily intoxicated at that juncture, an assumption which—in view of the conflicting evidence concerning how much Appellee drank before arriving at Woody's—depended largely on the contents of several 1999 defense affidavits, some of which remained untested. *See, e.g., id.* at 121; *see also id.* (acknowledging that, if Appellee did not fall asleep before arriving at Woody's, "that pokes a big hole in my opinion").[9]

As to the contents of Dr. O'Brien's report, Dr. Bernstein explained that Appellee's statements to Dr. O'Brien that he

8. Dr. Bernstein clarified that such impairment was different from the concept of brain damage, *see* N.T., May 14, 2009, at 139–40, and confirmed that most individuals who are diagnosed as alcohol abusers based on a similar usage history have the same type of altered brain chemistry that he believed Appellee exhibited. *See id.* at 141–42.

9. The only person whose testimony suggested that Appellee may have fallen asleep at Dooner's, Derrick Hook, later clarified that, although Appellee rested his head on a table with his eyes closed, he was coherent, responsive, and aware that Hook was about to leave the bar. *See* N.T., May 13, 2009, at 77. The only other time that Appellee might have fallen asleep was in the car on the way to Woody's. Appellee's

had not been abused as a child were less trustworthy than Dr. O'Brien's conclusions that childhood abuse had taken place, because children tend to "minimize" the abuse they experience. *Id.* at 22. Dr. Bernstein explained that this occurs because an abused child may feel a sense of shame and that, at an unconscious level, he may attempt to preserve his own sense of dignity and self-worth. Additionally, the child will often believe that whatever happens in his own home is normal. *See id.* at 22–23.

Lastly, Dr. Bernstein addressed Appellee's intellectual gifts and earlier academic achievement, describing the situation as akin to a "horse race ... between the dysfunctionality of the home and the degree to which the child has an innate intelligence and/or motivation." *Id.* at 17–18. In this respect, the doctor explained that it is not uncommon for children who have "a better set of genes" to "manifest some degree of normality and achievement" early in life, but "eventually ... the other chickens come home to roost." *Id.* at 18.

The final expert witness was the Commonwealth's rebuttal forensic psychiatrist, Dr. Timothy Michals, who interviewed and evaluated Appellee in January 2009, and submitted a report the following month. *See* Report of Timothy J. Michals, M.D., *reproduced as* Commonwealth Exhibit C–5 (Michals Report). In his report, Dr. Michals recited that Appellee performed well in high school, but that his grades in college suffered due to his involvement with drugs. Of note as well, Appellee started selling drugs at age 15, and was selling $9,000 worth of drugs daily by the time of murders. *See id.* at 5. Another salient aspect of the report indicates that Appellee rode with Tancemore and Green to Dooner's Bar, rather than walking there with Derrick Hook.[10]

Some of the data contained in the report overlapped with the reports and testimony of Drs. O'Brien and Bernstein. For

own trial testimony provides the sole indication that he fell asleep then. *See* N.T., Oct. 7, 1991, at 81.

10. Assuming Appellee admitted to Dr. Michals that he was still a drug dealer at the time of the offense, such admission would conflict with his trial testimony to the effect that he had stopped selling drugs in 1987.

example, Dr. Michals reported that Appellee was primarily raised by his maternal grandparents because his father was absent and his mother was usually out "partying," that his upbringing was "good," Michals Report at 8, and that he had been involved in using drugs and alcohol, and selling drugs, since his teen years. *See id.* at 15. Contrary to Dr. Bernstein, however, Dr. Michals reported that there was insufficient documentation in Appellee's treatment history to suggest a diagnosis of organic mood/personality disorder, and that he reached no findings in his own mental status exam to support a diagnosis of a mood disorder or any organic impairment as a result of alcohol or drug consumption. He opined, as well, that Appellee's self-report of his behavior relating to the criminal charges was inconsistent with being intoxicated by either drugs or alcohol at the time of the incident, *see id.*, concluding instead that Appellee's decision to go to Woody's and participate in a drug purchase was volitional and not primarily reflective of being impaired or intoxicated. *See id.* at 16.

Dr. Michals' testimony was also consistent in some respects with that of the defense experts, albeit there were some differences. He indicated that: during Appellee's upbringing he was treated well and was not substantially abused or neglected, *see* N.T., May 15, 2009, at 29–32, 132; Appellee did, however, "ha[ve] some difficulty" during his childhood insofar as his mother beat him with belts or sticks, *id.* at 134; alcohol was present in the house, which Appellee started consuming at age 14, *see id.* at 90; nevertheless, Appellee did not suffer from any mental disorder, and his memory was intact, *see id.* at 10–11; *see also id.* at 51 (referencing a lack of "aberrant behavior" during Appellee's childhood); Appellee never suffered from any organic mood disorder, organic impairment, or cognitive impairment, *see id.* at 46–47; Dr. O'Brien's and Mr. Byrne's diagnosis of alcohol and mixed substance abuse was

*See* N.T., Oct. 7, 1991, at 149. Also, any recounting whereby Appellee rode with Green and Tancemore to Dooner's would conflict with Derrick Hook's 2009 testimony that he and Appellee walked there. *See* N.T., May 13, 2009, at 69.

correct, *see id.* at 39, 66; such a diagnosis represents a mental health impairment and indicates that the person is over-using the drug to the point where it causes significant problems in his life, *see id.* at 39–40; drug and alcohol abuse is a major societal problem that the federal government is spending money to study and ameliorate, *see id.* at 69; and Appellee's thoughts and actions at Woody's during the incident were rational, goal-directed, and indicative of good motor skills, *see id.* at 17–19, 121.

Although on cross-examination Dr. Michals appeared to state that Appellee's diagnosis of alcohol and substance abuse constituted an extreme mental and emotional disturbance, *see id.* at 73, Dr. Michals explained that the "disturbance" he had in mind was the fact that Appellee altered his career path by dropping out of school and selling illegal drugs. *See id.* at 74; *see also id.* at 75 ("He made a choice. Basically, he dropped out of college and got involved in the drug culture."); *id.* at 76 ("He ... made that choice to sell drugs. It's very profitable."). Moreover, Dr. Michals noted his view on redirect that Appellee's substance abuse did not constitute an extreme mental or emotional disturbance for purposes of the (e)(2) mitigator, and did not substantially impair Appellee in his ability to conform his conduct to the law at the time of the offense. *See id.* at 118–20, 122.[11]

The PCRA court ultimately issued factual findings, in which it recounted the pertinent evidence in some detail, made credibility determinations, and resolved apparent conflicts in the testimony. *See Commonwealth v. Gibson*, No. 2809, January Term, 1991, *slip op.* at 1–25 (C.P. Phila. July 17, 2009).[12]

11. One other mental-health issue that arose briefly during Dr. Michals' testimony pertained to Department of Corrections records indicating that Appellee had been treated for major depression, an Axis–I diagnosis. *See* N.T., May 15, 2009, at 58. Dr. Michals did not consider this to be mitigating relative to the offense, suggesting that Appellee's depression resulted from the conviction and sentence. *See id.* at 61 (explaining that "[i]t's a depressing thing" to be convicted of murder and sentenced to death). Appellee's experts also did not attach mitigating significance to the depression diagnosis.

12. For example, this Court had observed that the previous post-conviction testimony given by Appellee's mother concerning her inability to

As noted, the court expressly credited the testimony of Drs. O'Brien and Bernstein, as well as that of Derrick Hook, Joan Gibson, and Niema Williamson. *See id.* at 27. As well, the court appeared to, at least partially, credit the testimony of Dr. Michals, expressing that many of the defense experts' opinions "were essentially accepted by ... Dr. Michals." *Id.*

In its legal conclusions, the PCRA court indicated that the evidence credibly supported three mitigating circumstances: that Appellee was under the influence of an extreme mental or emotional disturbance, *see* 42 Pa.C.S. § 9711(e)(2); that his capacity to conform his conduct to the law's requirements was substantially impaired, *see id.* § 9711(e)(3); and the catch-all mitigator, *see id.* § 9711(e)(8) (pertaining to "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense").[13] The court ultimately determined that there was a reasonable probability that, had these factors been developed by trial counsel, Appellee would have been able to convince at least one juror to "str[ike] a different balance" and vote to impose a life sentence. *Gibson,* No. 2809, *slip op.* at 28 (quoting *Commonwealth v. Sneed,* 587 Pa. 318, 346, 899 A.2d 1067, 1084 (2006)). Hence, the court held that Appellee had proven prejudice and,

restrain Appellee appeared to be in tension with her penalty-phase testimony to the effect that she was able to keep Appellee under her control. *See Gibson III,* 597 Pa. at 422, 951 A.2d at 1122. In its opinion on remand, the PCRA court clarified that Mrs. Gibson's penalty phase testimony indicated that she was able to prevent Appellee from "getting into trouble" during his childhood, whereas her post-conviction testimony referred to her inability to control Appellee as an adult. *Gibson,* No. 2809, *slip op.* at 6 n.2; *cf.* N.T., Oct. 7, 1991, at 245 (reflecting Mrs. Gibson's guilt-phase testimony that her school obligations left her with little time to keep track of Appellee as "a grown man").

13. Although trial counsel had argued for the catch-all mitigator, the jury found only the (e)(1) mitigator, *see* 42 Pa.C.S. § 9711(e)(1) (relating to the lack of a significant criminal history). The jury also found three aggravators for each murder—that Appellee committed the killing in perpetration of a felony (robbery), that he knowingly created a grave risk of death to another person in addition to the murder victim, and that he was convicted of another murder committed at the time of the offense at issue. *See id.* § 9711(d)(6), (7), (11). *See generally Gibson III,* 597 Pa. at 412, 951 A.2d at 1115–16; *Gibson I,* 547 Pa. at 81 n. 5, 688 A.2d at 1157 n. 5.

accordingly, reaffirmed its prior order, issued in April 2006, granting him a new penalty hearing.

The Commonwealth presently argues that Appellee bears a heavy burden to show prejudice because there was substantial aggravation, including the fact of multiple murders, the grave risk of death that his conduct of firing several rounds into a crowded bar imposed on other patrons, and the robbery conviction. In challenging Appellee's mitigation case on remand, the Commonwealth initially broadly attacks the believability of the PCRA mitigation account, asserting first that the "tales" the defense presented to the jury during the penalty phase, and to the PCRA court on remand, were "mutually contradictory," Brief for Commonwealth at 42, and additionally discounting the significance of the abuse testimony given nearly 19 years after the conviction—especially since no witness stated that he saw marks on Appellee from the alleged abuse, confronted Joan Gibson about her conduct, or intervened on Appellee's behalf. Along similar lines, the Commonwealth minimizes the importance of the 1999 affidavits which, it claims, are materially inconsistent with each other and with the trial and PCRA testimony, and purport to detail evidence from eight years earlier with "amazingly precise 'recollections' of" the number of drinks Appellee had on the evening in question, when the affiants also claimed to have been drinking. *Id.* at 44; *see also id.* (observing that, of all Appellee's friends who supplied affidavits, only one, Derrick Hook, testified). The Commonwealth finds these discrepancies and other perceived evidentiary flaws problematic because, it maintains, Appellee's mental-health experts relied uncritically on the documents in forming their opinions concerning mitigation relating to Appellee's childhood and his state of intoxication at the time of the incident.

Addressing the legal issues implicated by Appellee's mental-health mitigation case, the Commonwealth argues that Appellee's "path from successful student to substance-abusing criminal" cannot have represented an extreme mental or emotional disturbance as a matter of law because there must be evidence that such a disturbance existed at the time of the offense to

entitle the defendant to an instruction on the (e)(2) mitigator. *See id.* at 51–52 (citing *Commonwealth v. Rice*, 568 Pa. 182, 207, 795 A.2d 340, 355 (2002) (Opinion Announcing the Judgment of the Court)). As for the (e)(3) mitigator, the Commonwealth urges that a reasonable jury would not have accorded significant mitigating weight to Appellee's diagnosis of drug and alcohol abuse, as these stem from his voluntary actions of using such substances in an excessive manner and, moreover, there was little reliable evidence of extreme intoxication on the night in question. *See id.* at 58–60.

Appellee responds by pointing out that this Court reviews the PCRA court's rulings deferentially, as that court heard the evidence first hand and evaluated the credibility and weight of the testimony. Appellee maintains, in this regard, that the PCRA court's holding was supported by record evidence and free of legal error. Appellee also addresses the standard for entitlement to relief: that a "reasonable probability" of a different outcome must exist if the mental-health and intoxication evidence had been placed before the jury. He claims that such a probability exists here because the defense expert witnesses—who were "highly qualified, experienced psychiatrists" credited by the fact-finder—provided significant and weighty testimony "establishing the (e)(2), (e)(3), and (e)(8) mitigating circumstances." Brief for Appellee at 50–51.[14] Moreover, Appellee echoes the PCRA court's assessment that even the Commonwealth's expert agreed with much of the defense mitigation case when he conceded that Appellee was

---

14. Appellee alleges that there is also a reasonable probability that the jury would have found the (e)(4) "age" mitigating factor. He notes that jurors have found this factor when the defendant's age was 24 at the time of the offense, *see Commonwealth v. Fisher*, 564 Pa. 505, 515, 769 A.2d 1116, 1122 (2001); *Commonwealth v. Murphy*, 559 Pa. 71, 75, 739 A.2d 141, 143 (1999), and asserts that the "mitigating circumstance of youthful age is not measured solely by chronological age," but "encompasses such factors as ... home environment." Brief for Appellee at 58 (quoting *State v. Bey*, 129 N.J. 557, 610 A.2d 814, 842 (1992)). Appellee reasons that, at age 22, he was "barely out of a dysfunctional childhood, making his youth more mitigating than it would be for someone raised in a supportive home." *Id.* at 59. The PCRA court did not make any ruling concerning the (e)(4) mitigator, although Appellee raised the issue in his post-hearing brief.

raised in a dysfunctional household, a circumstance that is known to enhance the risk of substance abuse. Appellee generally argues, as to all of these proofs, that they would have cast the good-character evidence presented by trial counsel in a new light, making that evidence seem more mitigating in view of the troubled circumstances in which Appellee was raised. *See, e.g., id.* at 59 ("Because the jury did not know about [Appellee]'s traumatic upbringing, . . . the prosecutor . . . was able to put a *negative* spin on the good character testimony . . ., telling the jury [Appellee] was someone who was raised in a positive environment but 'who threw away, who took no advantage of some of the things God had given to him.' " (quoting N.T., Oct. 10, 1991, at 47) (emphasis in original)).

In addition, Appellee emphasizes that the lay witnesses at the 2006 and 2009 hearings were consistent and believable. For example, he proffers that the evidence showed that it was only after he became an adult, and his mother could no longer control him through physical beatings, *see supra* note 12, that he went astray, thus indicating that the PCRA court's resolution of otherwise conflicting testimony was proper and should be upheld. *See* Brief for Appellee at 55.

Finally, Appellee suggests that the expert mental health testimony could have caused the jury to attach more weight to the one mitigator it found, and attach less weight to the aggravators it found. For example, Appellee posits that the jury's finding that he had no significant history of prior criminal convictions would have seemed more impressive and, hence, more mitigating, in light of the mental-health and life-history evidence that emerged at the PCRA hearings. Correlatively, Appellee argues that the same evidence would have cast doubt upon the extent to which he could have knowingly created a grave risk of death to another person for purposes of Section 9711(d)(7), and made the other aggravators seem less deplorable. *See id.* at 57–58.

To be eligible for relief based on a claim of ineffective assistance of counsel, *see* 42 Pa.C.S. § 9543(a)(2)(ii), a PCRA

petitioner must demonstrate, by a preponderance of the evidence, that: (1) the underlying claim is of arguable merit; (2) no reasonable basis existed for counsel's action or omission; and (3) there is a reasonable probability that the result of the proceeding would have been different absent such error. *See Commonwealth v. Pierce,* 567 Pa. 186, 203, 786 A.2d 203, 213 (2001). Presently, the ineffectiveness claim pertains only to the penalty phase of trial, and this Court has previously determined that the arguable-merit and no-reasonable-strategy aspects of the test have been satisfied. Thus, Appellee was required, on remand, to prove prejudice—that is, a reasonable probability that, but for trial counsel's deficient performance, the outcome of the proceeding would have been different because at least one juror would have concluded that the mitigating circumstances outweighed (or were as weighty as) the aggravating ones. *See* 42 Pa.C.S. § 9711(c)(1)(iv); *Commonwealth v. Beasley,* 600 Pa. 458, 483, 967 A.2d 376, 391 (2009). In the present context, where the jury found at least one mitigating circumstance, the question is whether there is a reasonable probability that, had the PCRA evidence been adduced at the penalty phase, Appellee would have been able to prove at least one additional mitigating circumstance, and at least one juror would have concluded that the mitigating circumstances collectively outweighed the aggravating ones. *See Commonwealth v. Lesko,* 609 Pa. 128, 192–93, 15 A.3d 345, 383 (2011) (quoting *Commonwealth v. Brown,* 582 Pa. 461, 481, 872 A.2d 1139, 1150–51 (2005)).[15]

A "reasonable probability" in this context is a probability sufficient to undermine confidence in the death verdict that the jury returned. *See Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). When reviewing the PCRA court's determination that such a

---

**15.** This author has dissented to the position that proof tending to strengthen a mitigating factor actually found by the jury (or even one juror) can never, by itself, establish prejudice, on the theory that such proof could have affected the final balancing of the factors. *See Commonwealth v. Rios,* 591 Pa. 583, 647, 920 A.2d 790, 828 (2007) (Saylor, J., dissenting). In the wake of *Rios* and *Lesko,* however, the predicate requirement of proving an additional mitigating factor appears to be established. *See Rios,* 591 Pa. at 622, 920 A.2d at 812–13.

probability exists, we consider whether the court's conclusions are supported by record evidence and are free of legal error. *See Gibson III,* 597 Pa. at 419, 951 A.2d at 1120 (citing *Commonwealth v. Jones,* 590 Pa. 202, 216, 912 A.2d 268, 276 (2006)). Moreover, the resolution of capital-sentencing ineffectiveness claims "is frequently fact-intensive, so that, other than in terms of the pronouncement of overarching standards, the precedential effect of individual decisions may be limited." *Id.* at 421, 951 A.2d at 1121. Finally, in making the ultimate prejudice assessment, we reweigh the evidence in aggravation against the totality of available mitigating evidence, which includes the evidence presented at the penalty hearing and the evidence that would have been presented had counsel conducted a proper investigation. *See Commonwealth v. Sneed,* 587 Pa. 318, 346, 899 A.2d 1067, 1084 (2006), *abrogated on other grounds by Commonwealth v. Jones,* 597 Pa. 286, 951 A.2d 294 (2008); *Commonwealth v. Malloy,* 579 Pa. 425, 461, 856 A.2d 767, 789 (2004) (quoting *Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003), in turn citing *Williams v. Taylor,* 529 U.S. 362, 397–98, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000)).

As noted, in disposing of Appellee's claim, the PCRA court focused primarily upon lay and expert testimony concerning his childhood, expert testimony regarding his alcohol and mixed substance abuse diagnosis, and the possibility that he was intoxicated at the time of the killings. The court determined that such evidence credibly supported the (e)(2), (e)(3), and (e)(8) mitigators, and that, had it been placed before the jury, there is a reasonable probability at least one juror would have concluded that the balance of aggravating and mitigating circumstances warranted life imprisonment instead of death. We agree with the PCRA court that the mitigation case assembled at the PCRA hearings was weightier than the one presented to the jury. We are not as certain, however, that the difference between these two "mitigation packages," *Commonwealth v. Martin,* 607 Pa. 165, 213–14, 5 A.3d 177, 206 (2010) (Castille, C.J., concurring), was sufficient to undermine confidence in the outcome.

We observe, first, that the bulk of the expert testimony ostensibly supporting the (e)(2) mitigator pertained to Appellee's deliberate and repeated use of drugs and alcohol. For example, Dr. O'Brien predicated his conclusion that Appellee was under the influence of an extreme mental or emotional disturbance at the time of the offense, primarily upon Appellee's general diagnosis of alcohol and mixed substance abuse—which, as noted, he distinguished from dependence in that Appellee was not addicted to these substances, but continued to use them habitually in spite of their adverse effects on his life. Dr. O'Brien explained, in this respect, that a sharp disruption in Appellee's "life pathway," from good student to drug dealer, was attributable to his consumption of drugs and alcohol, and his becoming involved in the drug culture—and that it was on this basis that he (Dr. O'Brien) felt that Appellee was under an extreme mental or emotional disturbance at the time of the offense. *See Gibson,* No. 2809, January Term, 1991, *slip op.* at 14 ¶ 26(C). *See generally* N.T., May 13, 2009, at 206–07, 286–88.

It is not clear, however, that such testimony can offer significant support for the (e)(2) mitigating factor. In *Commonwealth v. Saranchak,* 581 Pa. 490, 512, 866 A.2d 292, 305 (2005), for example, this Court held that a substance-abuse diagnosis and alcohol consumption on the day in question do not by themselves support the concept that the defendant was under an extreme mental or emotional disturbance at the time of the offense.[16] Just as importantly, jurors are aware of a substantial volitional component involved in an individual's

16. Even where proffered mitigating evidence may not materially support a particular mitigator, such as subsection (e)(2), it may still be considered under subsection (e)(8). *See Commonwealth v. Williams,* 532 Pa. 265, 279, 615 A.2d 716, 723 (1992); *Commonwealth v. Fahy,* 512 Pa. 298, 317, 516 A.2d 689, 698 (1986) ("At sentencing, the defendant is free to introduce any evidence in mitigation which might persuade the sentencer to be lenient in determining his penalty."). Hence, the issue of whether the testimony in question supports subsection (e)(2) or (e)(3), as opposed to (e)(8), does not finally determine the question of prejudice—particularly where, as here, we agree with the PCRA court's determination that Appellee established a reasonable probability that the jury would have found the (e)(8) mitigator (*see infra*).

358

decision to use drugs and alcohol. *Cf. Montana v. Egelhoff,* 518 U.S. 37, 44, 116 S.Ct. 2013, 2018, 135 L.Ed.2d 361 (1996) (plurality) (noting that, historically, voluntary intoxication has been viewed by society as aggravating the severity of a given offense); *Hamilton v. Ganias,* 417 Mass. 666, 632 N.E.2d 407, 407–08 (1994); *Tobias v. Sports Club, Inc.,* 323 S.C. 345, 474 S.E.2d 450, 455 (1996) ("[V]oluntary intoxication is a self-indulgent act and 'a person who voluntarily consumes alcohol to the point of intoxication is at the very least partially responsible for his injuries.'" (quoting *Lyons v. Nasby,* 770 P.2d 1250, 1255 (Colo.1989))). As for Appellee's becoming involved in drug trafficking as a means of supporting his substance abuse, jurors would presumably be cognizant that drug trafficking can be more lucrative and require less work than pursuing a college degree, and that it involves a high degree of criminality that ultimately causes significant harm to society at large. *See* N.T., May 13, 2009, at 288 (reflecting the testimony of Dr. O'Brien that Appellee "basically became a chronic criminal"). As such, and consistent with *Saranchak,* we believe that Dr. O'Brien's testimony did not adequately support the concept that a reasonable juror might have viewed Appellee's substance abuse diagnosis, or his voluntary alcohol and/or drug ingestion on the evening in question, as establishing the (e)(2) mitigating circumstance.

Dr. Bernstein's testimony was somewhat more detailed, as he delved into the possibility that Appellee also suffered from a mood disorder and highlighted that, in all the years Appellee was a gun-carrying drug dealer, he was not reported to have engaged in any incidents of violence toward another person—thereby suggesting that his homicidal conduct at Woody's in December 1990 may have been an aberration. *See, e.g.,* N.T., May 14, 2009, at 46, 84–86, 89; *accord* N.T., May 13, 2009, at 226–27.[17] This, in turn, raised Dr.

17. As noted, although Dr. Bernstein described the mood disorder as being organic, he stated that this did not imply there was any brain damage. He also explained that the term "organic," in this context, means that there was an identifiable source for the disorder—namely, the drugs and alcohol—so that the mood changes were not merely idiosyncratic. *See* N.T., May 14, 2009, at 127–28.

Bernstein's suspicion that Appellee's actions could be attributed to the effects of drugs and alcohol, both as a matter of long-term, habitual use, as well as in placing Appellee in an abnormal state of mind at the relevant time.

Of course, our cautions delineated above pertaining to Dr. O'Brien's evidence apply equally to that of Dr. Bernstein insofar as his testimony overlaps with that of Dr. O'Brien. As for the additional facets that Dr. Bernstein added to the picture, we note that, although the PCRA court memorialized its decision to credit Dr. Bernstein's testimony as a general proposition, *see Gibson*, No. 2809, January Term, 1991, *slip op.* at 27 ¶ 49, it did not address the foundation of his testimony, including the fact that it was, by Dr. Bernstein's own admission (and as previously explained), based in significant part on untested declarations, *see, e.g.*, N.T., May 14, 2009, at 47, 59, 102, 125, and on the assumption, not well supported in the record, that Appellee's intoxication caused him to fall asleep before arriving at Woody's. *See id.* at 121–22; *see also supra* note 9 and accompanying text. Thus, even though Dr. Bernstein's opinion was credited, we do not agree that Appellee has established a reasonable probability that the sentencing jury would have found his assertions substantially mitigating under subsection (e)(2), inasmuch as they appear to have lacked a reliable factual basis—a point that the Commonwealth would likely have brought out through cross-examination, as it did during the PCRA hearings, and during its closing argument to the jury.

We are similarly hesitant concerning the PCRA court's determination that the PCRA evidence credibly supported the (e)(3) mitigating circumstance, which pertains to a defendant being substantially impaired in his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law. *See* 42 Pa.C.S. § 9711(e)(3). There is no dispute that Appellee appreciated the criminality of his conduct, for reasons already explained. The only question is the degree to which the PCRA evidence would have demonstrated to the jury that Appellee was substantially impaired in his capacity to conform to the law. The thrust of

the mental health experts' assertions was that the alcohol consumed by Appellee during the hours leading up to the murders had a "disinhibiting" effect on him that impaired his judgment, *see* N.T., May 13, 2009, at 214, 242, 253 (Dr. O'Brien); N.T., May 14, 2009, at 135–36 (Dr. Bernstein), and that this effect was pronounced in light of Appellee's substance abuse diagnosis and its attendant alteration of his brain chemistry. However, the jury heard Appellee's testimony that he had consumed alcohol on the night in question, *see* N.T., Oct. 7, 1991, at 79–80, and alcohol is widely known to have a disinhibiting effect. The potentially mitigating substantive information added by the mental health experts pertained to the premise that a person with an alcohol-abuse diagnosis may, while intoxicated, display good motor skills while remaining cognitively impaired in terms of inhibition.

Again, however, we believe that the jury would have viewed Appellee's use of alcohol and/or drugs at the relevant time as largely voluntary, particularly since there is no indication of chemical addiction or dependence, and there is nothing in the record suggesting that alcohol consumption impels persons to break the law notwithstanding that it may lower his inhibitions. Further, none of the experts testified that Appellee's intoxication was overpowering or overwhelming. To the contrary, Dr. O'Brien conceded that, even if Appellee was somewhat intoxicated, his intoxication was not overwhelming, *see* O'Brien Report at 5; N.T., May 13, 2009, at 255–57, and Dr. Bernstein noted that Appellee's memory of the event was intact and that his adrenaline would have had "alerting properties." N.T., May 14, 2009, at 117. All of this calls into question whether Appellee, as a matter of law, would have been entitled to an instruction on the (e)(3) mitigator. *See Commonwealth v. Flor*, 606 Pa. 384, 419 n. 7, 998 A.2d 606, 627 n. 7 (2010) (recognizing that, to demonstrate the (e)(3) mitigator based on voluntary intoxication, the defendant must have been "overwhelmed or overpowered by alcohol to the point of losing his faculties so as to be incapable of forming a specific intent to kill" (quoting *Commonwealth v. Marinelli*,

570 Pa. 622, 656, 810 A.2d 1257, 1277 (2002))).[18]  Therefore, Appellee's alcohol consumption, if it is mitigating, falls under the (e)(8), "catchall" mitigator.

We do think that the PCRA court was correct in stating that the proofs raised a reasonable prospect that the jury would have found the (e)(8) mitigator.  Although the jury heard some evidence that Appellee had a difficult childhood due to the neighborhood in which he was raised, *see, e.g.*, N.T., Oct. 10, 1991, at 11 (reflecting Joan Gibson's testimony that the neighborhood was a "jungle" in which the residents all carried guns and multiple "crack houses" existed on the same block as Appellee's home), due to trial counsel's strategy of supplying primarily good-character mitigation evidence the jury never learned about the more disturbing aspects of Appellee's youth.  In this regard, it is undeniable that Appellee had, at a minimum, a troubling childhood, in that his father abandoned the family and his mother essentially neglected her children on a regular basis while they were young.  Furthermore, it appears undisputed that Mrs. Gibson struck Appellee on multiple occasions while she was heavily intoxicated and that she brought home boyfriends who had violent tendencies and used alcohol, marijuana, and harder drugs in front of the children.  Finally, the record indicates that Appellee's maternal grandparents, while they may have been more helpful than Mrs. Gibson, were not entirely positive role models either, as they maintained a household in which alcohol consumption played a significant role.  While certainly one can envision even more severe circumstances, *see, e.g., Lesko,* 609 Pa. at 181–85, 15 A.3d at 377–78, we conclude that the record adequately supports the PCRA court's determination that Appellee carried his burden to demonstrate a reasonable probability that at least one juror would have found the (e)(8) mitigator,

18.  Appellee candidly acknowledges this standard, but avers that it is incorrect because it implies that the (e)(3) mitigator can never be proved based on voluntary intoxication alone, since by the time a penalty hearing is convened the jury has already determined that the defendant had a specific intent to kill.  *See* Brief for Appellee at 69 n.7. We note, however, that *Flor* and *Marinelli* are binding precedent, and the jury may consider voluntary intoxication of a lesser degree under subsection (e)(8).  *See supra* note 16.

particularly in light of the defense mental-health experts' explanation that this type of upbringing augments the risk of chronic substance abuse as an adult. *See generally* 42 Pa.C.S. § 9711(e)(8) (encompassing "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense").

The question becomes, then, whether the (e)(8) factor, when combined with the (e)(1) circumstance found by the jury, would have been reasonably likely to alter the outcome. As noted, we must reweigh the evidence in aggravation against the totality of available mitigating evidence, *see Malloy*, 579 Pa. at 461, 856 A.2d at 789, and determine whether we agree with the PCRA court that at least one juror would have been reasonably likely to vote for life imprisonment.[19]

Such reweighing, of course, is not an exact science, as a reviewing court cannot know with certainty exactly how twelve jurors would have reacted to testimony that they never heard. Nevertheless, we can evaluate the relative strength of the aggravation and mitigation, as well as the parties' arguments in light of the full record. In this regard, we note our agreement with some of Appellee's proffer. For example, it seems reasonable to conclude that the Commonwealth would have had difficulty in placing what Appellee terms a "negative spin" on the good-character testimony that he presented at the penalty hearing, if a fuller picture of his childhood had been put before the jury. On the other hand, we are less certain than Appellee that the jurors would have given more weight to the (e)(1) mitigator if they had learned more details about his background. That statutory factor, by its terms, pertains to the lack of a significant history of prior criminal *convictions*, and the jury was instructed accordingly. *See* N.T., Oct. 10, 1991, at 78. The fuller picture of Appellee's life history, as presented to the PCRA court, confirms that he

---

**19.** As in *Lesko*, the PCRA court did not preside over the sentencing phase of trial. *See Lesko*, 609 Pa. at 195 n. 20, 15 A.3d at 385 n. 20 (indicating that the PCRA court was "no better positioned than this Court to assess the effect the evidence at the PCRA hearing would have had" on the sentencing jury).

distributed illegal drugs on a daily basis for months, if not years. Thus, while the jury may have still have found the (e)(1) factor based on a dearth of convictions, it would have understood that Appellee was, as his own expert testified, a "chronic criminal," and that the absence of convictions meant that he was able to avoid being held criminally responsible.

In light of the above and other factors previously discussed, and upon a careful review of the mitigation and aggravation as reflected in the entire trial and post-conviction record, we conclude that the new evidence in mitigation, even subsuming the intoxication evidence, is not reasonably likely to have swayed a juror to alter his or her vote. While we do not diminish the childhood troubles or substance abuse evident in Appellee's background, the aggravation found by the jury was powerful: Appellee fired three rounds into a crowded bar, instantly killing Vernae Nixon, mortally wounding Officer Dukes, and imposing a grave risk of death upon other patrons, all during an attempted robbery. Against these aggravating factors, the life-history and mental-health mitigation is not compelling for reasons already discussed, including that it placed substantial emphasis on Appellee's decision to abandon educational and professional opportunities in favor of a life on the streets using alcohol and drugs, carrying a gun, and selling illegal drugs, and on his voluntary actions in becoming intoxicated before committing the murders. *See generally Lesko*, 609 Pa. at 191–95, 15 A.3d at 383–84 (discussing *Smith v. Spisak*, —— U.S. ——, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010), and expressing that, where there is substantial aggravation, it may be particularly difficult to prove *Strickland* prejudice based on additional mitigation submitted at the post-conviction stage). While the evidence of Appellee's dysfunctional childhood is undoubtedly mitigating, we find that it is not enough to undermine confidence in the jury's verdict. Therefore, on this record, we hold that the PCRA court's conclusion that counsel's omissions resulted in prejudice cannot be sustained.[20]

**20.** As noted, the PCRA court made no ruling on Appellee's argument concerning the age mitigating circumstance. We need not presently resolve his claim regarding the likelihood that the jurors would have

Accordingly, we reverse the order of the PCRA court, and deny the petition for post-conviction relief. The Prothonotary of this Court is directed to transmit the complete record of this case to the Governor of Pennsylvania in accordance with Section 9711(i) of the Judicial Code, 42 Pa.C.S. § 9711(i).

Chief Justice CASTILLE, and Justices EAKIN, BAER, TODD, McCAFFERY and ORIE MELVIN join the opinion.

found that mitigator, *see supra* note 14, because we conclude that, even if they had, it is not reasonably likely to have altered the final sentencing decision.