[J-145A&B-2012][M.O. – Per Curiam]

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 650 CAP |
| | : | |
| Appellee | : | |
| | : | Appeal from the Order dated 12/30/11 |
| v. | : | (docketed on 1/3/12) in the Court of |
| | : | Common Pleas, Criminal Division, |
| MICHAEL BARDO, | : | Luzerne County at No. CP-40-MD- |
| | : | 0002778-1992 |
| Appellant | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 651 CAP |
| | : | |
| Appellant | : | |
| | : | Appeal from the Order dated 12/30/11 |
| v. | : | (docketed on 1/3/12) in the Court of |
| | : | Common Pleas, Criminal Division, |
| | : | Luzerne County at No. CP-40-MD- |
| MICHAEL BARDO, | : | 0002778-1992 |
| | : | |
| Appellee | : | SUBMITTED:  NOVEMBER 5, 2012 |

## CONCURRING OPINION AND OPINION IN SUPPORT OF AFFIRMANCE ON

## DOCKET NO. 651 CAP

**MR. JUSTICE SAYLOR**                              **DECIDED:  December 16, 2014**

I join Part II of the per curiam opinion, captioned "Bardo's Appeal (650 CAP),"
and thus, I support affirmance of the denial of guilt-phase relief.

As to penalty, however, I would credit the portion of the reasoning and holding of
the post-conviction court that is attached as an appendix, which I find to be sufficiently
supported by the record and free from error.  In particular, contrary to the per curiam's

repeated assertion that the post-conviction evidence was merely cumulative, I agree with the PCRA court that the penalty-phase presentation "fail[ed] to synthesize readily available life history evidence of mental illness, family dysfunction and physical and sexual abuse into a coherent and persuasive case," such that, "considering the nature and quantity and quality of the evidence, [the PCRA hearing was] an entirely new presentation." Commonwealth v. Bardo, No. 2778 of 1992, slip op. at 37, 44 (C.P. Luzerne Jan. 3, 2012). Accordingly, I would affirm the PCRA court's grant of a new sentencing hearing.

## Appendix

## Excerpts from Commonwealth v. Bardo, No. 2778 of 1992, slip op. (C.P. Luzerne Jan. 3, 2012) (Toole, J.) (footnotes omitted)

\* \* \*

## THE PENALTY PHASE

There is no factual or legal question that Bardo committed a horrific offense and that the guilt phase record of the trial was more than sufficient to warrant and sustain the verdicts of the jury. See Com. v. Bardo, 709 A.2d 871 (Pa. 1998). In view of the verdict of first degree murder, the jury was charged with the responsibility of deciding whether Bardo was to be sentenced to death or life imprisonment. 42 Pa. C.S.A. Sec. 9711(a).

As previously noted, the jury found two aggravating circumstances: (1) that the defendant committed the killing while in the perpetration of a felony (42 Pa. C.S.A. Sec. 9711(d)(6)) and (2) that the victim was a child under 12 years of age (42 Pa. C.S.A. Sec. 9711(d)(16)). Further, the Court submitted to the jury the following mitigating circumstances upon which there was some evidence: (i) mother's testimony, (ii) home conditions, (iii) school records and background, (iv) acceptance of responsibility/remorse, (v) willingness to plead, and the Court also advised the jury (vi) "any other evidence in mitigation concerning the character and record of the defendant and the circumstances of his offense." The jury found the following mitigating factors: (1) Bardo's mother's testimony, (2) his home conditions, (3) his school records and background, (4) his acceptance of responsibility and/or remorse, and (5) his willingness to plead. Each juror weighed the aggravating and mitigating circumstances and they unanimously concluded that the aggravating circumstances outweighed any mitigating circumstance, and returned a verdict of death.

This Court is now called upon to decide whether the jury in the penalty phase heard and considered all of the evidence that was available and could have been presented on the issue of mitigating circumstances. If not, did any lack of presentation deny Bardo his constitutional right to a full, fair and impartial trial? The question we must now consider and resolve is whether Bardo's defense team's evidentiary presentation fell below the standard expected and required of counsel in a penalty phase of a capital trial. Bardo now contends that the evidentiary presentation in the penalty phase of his trial was constitutionally deficient because counsels failed to introduce relevant evidence in their possession and failed to conduct a proper

investigation which would have disclosed other substantial mitigation evidence and circumstances which could and should have been submitted to the jury.

### Ineffective Assistance

The test to be employed in considering ineffectiveness during a penalty stage is succinctly set forth in Com. v. Paddy, 15 A.3d 431, 468, m. 23 (Pa. 2011). In that case the Court reviewed applicable United States Supreme Court precedent and concluded the ineffectiveness standard in the penalty phase remains that articulated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984):

Appellant relies primarily on three United States Supreme court decisions, all of which were decided well after his trial, for his claim of trial counsel ineffectiveness for failure to present life history mitigation evidence. These cases are the following: Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed. 2d 360 (2005); Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed. 2d 471 (2003); Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). . . .

[T]he cases cited by Appellant did not set forth any new constitutional standards governing claims of ineffective assistance of counsel. The test governing penalty-phase Counsels' preparation and performance was – and remains – Strickland v. Washington, 466 U.S. 668; 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). See also Commonwealth v. Beasley, 600 Pa. 458, 967 A.2d 376, 390 (2009)(stating that "…the United States Supreme Court has maintained that its opinions in the Williams and Wiggins line 'made no new law,' but rather, represent an application of clearly established precedent"). The Strickland test is materially identical to Pennsylvania's tripartite test for ineffective assistance of counsel. . . .

Very recently, in a series of opinions, the United States Supreme Court has further clarified that Strickland continues to set forth the governing standard for claims of ineffectiveness. See Bobby v. Van Hook, ___ U.S. ___, ___, ___, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009)(per curiam)(reiterating that, pursuant to Strickland, criminal defendants are entitled to "representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms," and holding that defense Counsels' decision not to seek even more mitigating evidence than the substantial amount he had already uncovered from the petitioner's background fell well within the range of professionally reasonable judgments)(internal quotation marks omitted); Porter v. McCollum, ___ U.S. ___, ___, 130 S.Ct. 447, 453, 175 L.Ed.2d 398 (2009)(per curiam)(holding that defense Counsels' decision not to

investigate mitigating evidence "did not reflect reasonable professional judgment," where counsel had "not even take[n] the first step of interviewing witnesses or requesting records[,] … ignored pertinent avenues for investigation of which he should have been aware, … and thus failed to uncover and present any evidence of [the petitioner's] mental health or mental impairment, his family background, or his military service"); Sears v. Upton, ___ U.S. ___, ___, 130 S.Ct. 3259, 3264-67, 177 L.Ed.2d 1025 (2010)(per curiam)(explaining the prejudice inquiry required under Strickland's ineffectiveness standard).

15 A.3d 431, 468, n.23 (Pa. 2011).

Additionally, any trial court reviewing a capital case in the PCRA context must be mindful of the Pennsylvania Supreme Court's recent decision in Com. v. Gibson, 19 A.3d 512 (Pa. 2011). There the Court reversed a trial court's determination that a capital petitioner had, in fact, established prejudice as a result of trial counsel's failure to develop mental health mitigation evidence. The trial court determined there was a reasonable probability that, had the information there considered been developed by counsel, the defendant would have been able to convince at least one juror to strike a different balance and vote to impose a life sentence. This, the trial court concluded, had demonstrated prejudice and therefore granted a new penalty hearing. Id. 19 A.3d 523, 524.

On appeal, Petitioner argued the PCRA Court's rulings must be reviewed deferentially and further claimed the aforementioned probability existed because the Defense expert witnesses – who were described as highly-qualified, experienced psychiatrists – were credited by the trial court and provided significant and weighty testimony establishing (e)(2), (e)(3) and (e)(8) mitigating circumstances. Additionally, Petitioner argued the expert mental health testimony could have caused the jury to attach more weight to a found mitigator and attach less weight to found aggravators.

Justice Saylor, writing for the Court, initially indicated the ineffectiveness claim pertained only to the penalty phase of the trial, and the Supreme Court had previously determined that the arguable-merit and no-reasonable-strategy aspects of the test had been satisfied. The appellee was required to prove prejudice. To demonstrate prejudice in the context of a penalty phase ineffectiveness claim, a petitioner must prove "a reasonable probability that, but for trial counsel's deficient performance, the outcome of the proceeding would have been different because at least one juror would have concluded that the mitigating circumstances outweighed, or were as weighty as the aggravating ones." Id. at 526. Justice Saylor further explained a "reasonable probability" is a probability sufficient to undermine confidence in the death verdict that the jury returned. In making this prejudice assessment, a reviewing Court must reweigh the evidence in aggravation against the totality of available mitigating evidence, which

includes the evidence presented at the penalty hearing and the evidence that would have been presented had counsel conducted a proper investigation. Id. at 526.

The Supreme Court agreed with the trial court that the case assembled during the PCRA hearing was indeed weightier than that presented to the original jury. However, our highest Court disagreed with the trial court and concluded it was not sufficient to undermine confidence in the outcome. Interestingly, the Opinion also notes that a substance-abuse diagnosis and alcohol consumption there considered did not, in and of themselves, support the concept that the defendant was under an extreme mental or emotional disturbance at the time of the offense. Id. at 527.

> "Just as importantly, jurors are aware of a substantial volitional component involved in an individual's decision to use drugs and alcohol (citation omitted)(noting that, historically, voluntary intoxication has been viewed by society as aggravating the severity of a given offense); (citation omitted)('[V]oluntary intoxication is a self-indulgent act' and 'a person who voluntarily consumes alcohol to the point of intoxication is, at the very least, partially responsible for his injuries."

Id. at 527.

The Supreme Court similarly rejected Petitioner's argument regarding consumption of alcohol on the night in question vis-à-vis mitigator (e)(3), noting "we believe that the jury would have viewed appellee's use of alcohol and/or drugs at the relevant time as largely voluntary, particularly since there is no indication of chemical addiction or dependence, and there is nothing in the record suggesting that alcohol consumption impels persons to break the law, notwithstanding that it may lower his inhibitions. Further, none of the experts testified that appellee's intoxication was overpowering or overwhelming." Id. at 529.

Although the Supreme Court concluded the PCRA Court's determination appellee satisfied his burden to demonstrate a reasonable probability that at least one juror would have found the (e)(8) mitigator – given the defense mental health experts explanation of the appellee's upbringing and risk of chronic substance abuse – it nevertheless determined consideration of that factor would not have been reasonably likely to alter the outcome.

Gibson also noted, where there is substantial aggravation, it may be particularly difficult to prove Strickland prejudice based on additional mitigation submitted at the post-conviction stage. Id. at 531 citing Smith v. Spisak, ___ U.S. ___, 130 S.Ct. 676 (2010). The Opinion also acknowledged, while evidence of appellee's dysfunctional childhood is undoubtedly mitigating, it is not enough to undermine confidence in the jury's verdict.

Trial courts have also been instructed that a bald allegation of prejudice establishes nothing.  Com. v. Birdsong, 24 A.3d 319, 341 (Pa. 2011).  If all that can be demonstrated is merely that a defense strategy did not work out as well as counsel hoped, an ineffectiveness claim should not be granted.  Id. at 319 citing Harrington v. Richter, ___ U.S. ___, 131 S.Ct. 770, 790-92 (2011).  In Birdsong, the Pennsylvania Supreme Court affirmed the trial court's denial, in the capital context, of numerous ineffectiveness claims during both the guilt and penalty phase.

\*          \*          \*

### Specific Comparison

This Court is mindful of its obligation to develop a specific comparison of the mitigating case presented at trial with the credited evidence offered on post conviction review with the object of elaborating on why it is or is not reasonably probable that at least one juror might have assigned weight to Bardo's credited post conviction evidence equal or greater to the aggravation found by the jury.  See Com. v. Gibson, 951 A.2d 1122, 1123 (2008).

During the penalty phase of the trial, Bardo's Trial Counsel presented testimony from seven mitigation witnesses.  The entire presentation by those witnesses is reported in the record from page 703 to page 795, a total of 92 pages.  That is contrasted with the PCRA evidentiary presentation from seven witnesses presented on behalf of Bardo which covered approximately 500 pages (pp. 5-595) and at least 41 identified exhibits.  The Commonwealth, on the other hand, called one witness (Dr. John S. O'Brien) whose evidentiary presentation covered 129 pages of the PCRA record (pp. 595-724).  Our comparison follows:

### THE PENALTY PRESENTATION

Bardo's Trial Counsels' evidentiary presentation is summarized as follows:

1.  William Stephens, the Wilkes-Barre City health inspector, testified that, in September of 1992, his department inspected the home where Bardo was raised and discovered a large number of animals, and that it was infested with fleas.  N.T. Trial at p. 705.

2.  Jackie Kostelac, a neighbor of the home where Bardo was raised, testified that the noise coming from the Bardo residence was "loud" and "undesirable" and that she had observed family members "fighting in the street."  Id. at 754-55.

3. Peter Truszkowski, the assistant principal at Plains Junior High School (the last school Bardo attended) testified regarding Bardo's school history. Id. at 710. He stated that he had reviewed Bardo's entire school record and that he had said records present with him in court. Id. He also testified that communication was made with Bardo's parents regarding academics, discipline, and attendance, but "things did not change that much." Id. at 718. At age 15, Bardo went to the Children's Service Center, which was "a service that is provided to individuals that would be in need of help . . . help would be family, help with school, help with one's problems, help in order to get this child to be able to function properly within a school setting." Id. at 727-28. Bardo dropped out of school in 9th grade at age 17. Id. at 717.

4. Charlotte Kordek testified that she taught Bardo sciene in 7th grade and was his homeroom and study hall teacher for a short time in 8th grade. Id. at 730. She described Bardo's academic performance and appearance as poor, but he was not a behavior problem. Id. at 730. She testified that it was "extremely difficult" to contact Bardo's parents, and "there was no cooperation" on the one occasion contact was made. Id. at 732.

5. Arlene Yetter testified that she taught Bardo in 9th grade. Id. at 748. She recalled that, at that time, he was 17 years old, married, and living with his wife's parents. Id. at 747-49.

6. Judith Wolfe, Bardo's mother, testified that Bardo is the sixth of six children. Id. at 756. Bardo's biological father was an alcoholic, who attempted suicide in front of her, and they divorced when Bardo was a year and a half or two years old. Id. at 757-59. She testified that Bardo's step-father, Dennis Wolfe, did not support Bardo, i.e., was not a father figure. Id. at 763. She stated that Bardo started drinking alcohol at approximately age 13. Id. at 764. At age 18, Bardo told her that, when he was younger, an adult male ("T.C.") would provide him with alcohol, "get him drunk," and "sexually abuse him. Id. at 765-67. At age 16, Bardo married Dawn Havach, and they had two children, Susie and Michael. Id. at 767-68. At one point in time, Bardo and his wife lived in an empty warehouse. Id. at 770. Bardo's mother asked the jury to spare her son's life. Id. at 773.

7. Finally, Bardo testified that he was 23 years old and divorced with two children. Id. at 774. He testified that his mother was a good mother, and that he did not know his biological father other than what he had heard, namely, that his father was an alcoholic who cut his wrists. Id. at 775-76. His step-father was "[n]ot really" involved with his life and did not do fatherly things with him. Id. at 777. Bardo testified that he himself was an alcoholic, who started drinking around 11 or 12 and would binge drink to the point of blacking out.

Id. at 776, 779-80. When he was 13 or 14, he met T.C., who would buy him beer and, on one occasion at T.C.'s house, Bardo woke up naked. Id. at 17. Id. at 778, 781. At one point, he attended the Adolescent Learning Center at the Children's Service Center. Id. at 778, 788. He testified that he and his wife lived "on the streets" for a while, sleeping in an old abandoned warehouse. Id. at 790-91, Bardo testified that, in 1985, he and his wife tried attempted suicide by taking prescription pills. Id. at 786. That same year, he attempted suicide again by slitting his wrists. Id. at 787. He testified that, as a result of those suicide attempts, he was hospitalized twice for a month at a time. Id. at 786-87. Finally, Bardo accepted responsibility for the victim's death and asked the jury for mercy. Id. at 791-93.

## THE PCRA PRESENTATION

### Trial Counsels' Failure to Discover and Present Evidence that, at the Time of the Offense, Bardo Suffered from a Constellation of Serious Mental Disorders

Neil Blumberg, M.D., a forensic psychiatrist, testified during the PCRA hearing. Dr. Blumberg opined there was significant mental health mitigation information which could have been presented to the sentencing jury gleaned from the readily available records at the time of trial. This evidence was not presented to the sentencing jury and reveals both Bardo's social history and a basis for several diagnoses strongly supporting statutory mitigating factors.

Bardo's social history was well-documented in voluminous contemporaneous records available to Trial Counsel. Id. at 21-22, 79. These records, including Bardo's juvenile probation file and Luzerne County Children and Youth file, document Bardo's childhood neglect. See, Pet. Ex. 3, 4, 5, 6, and 7; N.T. PCRA at 32-37. Trial Counsel failed to request any records pertaining to Bardo's sibling or other family members. Id. at 351-52. It is clear from the record that the degree and depth of neglect experienced by Bardo, outlined in the aforesaid documents, was never presented to the sentencing jury.

Bardo's genetic predisposition to alcoholism and drinking at an early age was also well-documented in records readily available to Trial Counsel. These records included First Wyoming Valley Hospital records (Pet. Ex. 10, 11 and 17); Wilkes-Barre General Hospital records (Pet. Ex. 13 and 14); Citations for Public Drunkenness (Pet. Ex. 15, 16 and 39) and a 1986 letter from the Court Advocate Program (Pet. Ex. 12). These records reveal Bardo's father was an alcoholic with a history of suicide attempts and that Bardo began drinking around the age of 11. N.T. PCRA at 20, 439, 533, 678-79. As Bardo's drinking escalated, he regularly experienced blackouts and a loss of control, injuring himself and/or endangering others. Id. at 29, 43-47, 51-52, 55-58, 709.

This evidence was not presented for the jury's consideration during the sentencing phase.

Bardo's history of sexual victimization during childhood was similarly well-documented in records readily available to Trial Counsel. These records included a Multimodal Life History Questionnaire completed in 1988 (Pet. Ex. 23), an Autobiography Outline also completed in 1988 (Pet. Ex. 24), an intake evaluation by Community Counseling Services, dated July 27, 1988 (Pet. Ex. 25), and an Investigative Report of February 27, 1988 (Com. Ex. 3). These records reflect a sexual assault by an adult when Bardo was 13. Bardo and the adult male often engaged in oral sex but, on one occasion, Bardo was drunk, passed out in the adult's apartment and woke up naked. The adult advised Bardo they had engaged in anal sex. N.T. PCRA at 74-75, 78-81, 122-23, 154-55. This documentary evidence was not presented to the sentencing jury except through uncorroborated family testimony.

Bardo's psychiatric interventions were also well-documented in records readily available to Trial Counsel. These records include Bardo's Juvenile Probation File from 1983 (Pet. Ex. 8), West Wyoming Valley Hospital Social Service Assessment dated 7/31/85 (Pet. Ex. 17), Discharge Summary dated 9/17/95 (Pet. Ex. 18), Discharge Face Sheet, dated 8/3/88 (Pet. Ex. 21). The juvenile probation file contains letters and notes from 1983 recommending to Bardo's family that he and his entire family should be referred to Children's Service Center for a psychiatric examination and that this recommendation was not followed. See, N.T. PCRA at 38-40. In 1985, Bardo and his girlfriend tried to commit suicide together. He was diagnosed with Major Depression, Recurrent. Id. at 58-60. In 1988, Bardo tried to commit suicide again by cutting his wrists after drinking five to six sixteen-ounce cans of beer and was involuntarily committed by his mother. Id. at 61-63, 86. He was psychiatrically hospitalized for a third time in 1988, diagnosed with Dysthymic Disorder and treated with Elavil, later changed to another antidepressant and an antipsychotic because Bardo reported that he began drinking again and was hearing voices. Id. at 66-69. This mitigating evidence was not investigated and/or presented to the sentencing jury.

During the PCRA Hearing, Dr. Blumberg summarized the aforesaid records. From extensive record review and interviews with Bardo, the witness learned of Bardo's childhood of poverty, neglect and physical abuse. N.T. PCRA at 12-17. He related these records indicated Bardo was sexually abused as a child; that he began abusing alcohol at around the age of eleven; that he was physically abused and neglected by his parents; and, in describing Bardo's home environment, that "[d]ysfunction is … a minor description of what was going on. It was extremely chaotic, neglectful, abusive, and that is well-documented in the records." Id. at 19-21, 27.

Dr. Blumberg also described the lack of parental support and supervision Bardo received regarding schooling. Bardo was physically neglected by his parents, even as a

young child, and was sent to day care unwashed, unfed and in clothing that was dirty and inappropriate for the weather. Id. at 25-27. Bardo also suffered physical abuse as a child administered by his stepfather who would beat Bardo with a belt or paddle and by his mother who would beat him using her hands or a switch. Id. at 27. Bardo was also sexually abused as a child. When he was as young as twelve, he had oral sex with a much older male adult and on one occasion was anally raped by that adult; Id. at 53.

Additionally, Dr. Blumberg opined Bardo had a genetic predisposition to depression and alcohol abuse. Id. at 22-23. The alcohol abuse was so severe that he often injured himself while intoxicated. Id. Bardo also attempted suicide as many as twenty times. Id. at 27-28.

Based on Bardo's social history as revealed through self-reporting and historical records, Dr. Blumberg concluded Bardo suffered from the following mental illnesses at the time of the offense: 1) Post-traumatic Stress Disorder, Chronic (PTSD), N.T. PCRA at 18-19, 85-93; 2) Dysthymic Disorder, Early Onset, Id. at 18-19, 65-69; 3) Alcohol Intoxication and Alcohol Dependency, Id. at 18-19, 40-65; 4) Personality Disorder Not Otherwise Sepcified with Schizoid, Depressive and Inadequate Features, Id. at 18-19, 69-74; and 5) Pedophilia, Sexually Attracted to Females, Non-Exclusive. Id. at 18-19, 82-85. Based on these diagnoses, Dr. Blumberg concluded that Bardo was substantially impaired in his capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. Id. at 93-97. Therefore, Bardo met the substantially impaired statutory mitigating fact found at 42 Pa. C.S.A. Sec. 9711(e)(3). Id. In addition, Dr. Blumberg concluded Bardo suffered from an extreme mental or emotional disturbance at the time of the offense and therefore, met the extreme disturbance statutory mitigating factor under 42 Pa. C.S. Sec. 9711(e)(2).

Dr. Matthew Berger, a forensic psychologist, testified regarding Bardo's "childhood experiences" of "emotional neglect and abuse" as well as his abuse of alcohol since the age of 11 (N.T. PCRA pp. 530, 533-34, 535-39, 540-43, 547-48, 567-69, 569-70). Dr. Berger opined that Bardo suffered from: "major depression recurrent, very possible dysthymic, and also at the time I saw him most recently, he had some symptoms of post-traumatic stress disorder, and some of what he told me about the events at the time would also indicate he had symptoms of PTSD." Also, clearly from the history alcohol/substance abuse chronic and long-term alcoholism were there and present (N.T. PCRA p. 528). He also testified Bardo was a pedophile (PCRA p. 561, 581-82, 584-87, 592-93) as well as the conclusion that as a result of mental impairment at the time of the offense, Bardo suffered from an extreme mental or emotional disturbance (PCRA p. 549).

\*   \*   \*

The Commonwealth, as noted, called Dr. John O'Brien as an expert in forensic psychology. Dr. O'Brien diagnosed Bardo with alcohol abuse by history, mixed personality disorder including antisocial dependent and avoidant features. Dr. O'Brien did not render a diagnosis of alcohol intoxication because there was no indication that Bardo was overwhelmingly intoxicated to the extent of lacking his faculties and sensibilities or impaired in his ability to formulate and carry out intentional behaviors (PCRA pp. 645-48), nor did Dr. O'Brien find alcohol dependence because of lack of withdrawal symptoms, evidence of escalating alcohol use and his ability to function without apparent employment difficulties (PCRA pp. 642-648-50). Dr. O'Brien did not find a post-traumatic stress disorder (PCRA pp. 611-13, 643, 650-57). Dr. O'Brien also rejected the diagnosis of dysthymic disorder (PCRA pp. 657-60, 717) nor a pedophilia diagnosis (PCRA pp. 643, 645, 660, 661). The Doctor also indicated his investigation did not reveal any schizoid depressive and inadequate features (PCRA pp. 664-65) or make a diagnosis of dysthymic and/or personality disorder NOS (PCRA p. 666).

We have heard and reviewed testimony given by the experts, particularly Dr. Blumberg and Dr. O'Brien, and we are aware of the importance, particularly in a case of this nature, that we assess the credibility of the experts. In that regard, we understand that each of the experts have their opinion. We believe both are credible, but on the basis of what we saw and what we heard, we are persuaded by and more comfortable with the testimony presented by PCRA Counsel.

### Trial Counsels' Failure to Present Information Detailing Bardo's Years of Mental Health Treatment and Childhood of Neglect and Abuse

Trial Counsel failed to present readily available records which could have, at the very least, corroborated the testimony presented at the penalty phase. More important, this evidence would have formed the basis for additional mitigating factors for the jury to utilize in the penalty proceeding. These records included those already contained within Trial Counsels' file, as well as other records concerning the Bardo family and Bardo's non-psychiatric hospitalization records.

As noted above, Trial Counsel had in their possession voluminous records detailing Bardo's extensive history of childhood neglect, physical and sexual abuse, mental health disorders and mental health treatment. Records secured by Defense Counsel prior to trial indicated, among other things, the following:

1)      As a child Mr. Bardo was disciplined with beatings with a paddle or belt;

2)      Throughout his teenage years, he had been sexually abused many times by an adult male;

3)   He had been an alcoholic since the age of eleven and had suffered numerous blackouts as a result of his abusive drinking;

4)   He was observed to be an abuser of marijuana and glue sniffing at various times;

5)   He reported frequent headaches and hearing problems;

6)   His parents disregarded early attempts to have him and his family undergo psychiatric evaluation;

7)   Between 1985 and 1988 he attempted suicide on at least three occasions;

8)   In 1985 he had a psychiatric hospitalization, during which he was diagnosed as suffering from Major Depression, Recurrent;

9)   After a second psychiatric hospitalization that same year, he was diagnosed with Major Depression, Recurrent, with an additional note of suicidal ideation;

10)  He had a partial psychiatric hospitalization in 1986; and

11)  During another hospitalization in 1988, he was diagnosed with Dysthymic Disorder, Dependent Personality Disorder, Depression and an additional note of suicidal ideation.

[(citations omitted)].

Apropos of Counsels' stewardship, the Trial Judge was advised the Defense intended to call as a witness a representative from Children's Service Center during the penalty phase in order to admit records concerning Bardo's efforts at the program's Adolescent Learning Center (See, N.T. Trial at 745-746), and although two such representatives were subpoenaed and available to testify, they were never offered. See, N.T. PCRA at 422.

In addition, Trial Counsel failed to obtain the juvenile probation file of George Bardo or the complete CYS file on the Bardo Family. See, N.T. PCRA at 351-352. Drs. Blumberg and Berger underscored the importance of these undiscovered records to their findings. Id. at 34-35, 540-41. Trial Counsel acknowledged these records should have been employed during the mitigation phase of this case. Id. at 434, 348-49.

Finally, Trial Counsel failed to obtain the non-psychiatric hospitalization or school records for Bardo. See, N.T. PCRA at 356-63. Drs. Blumberg and Berger related the importance of the non-psychiatric hospitalization to their findings. Id. at 51-52, 536-37.

Dr. Blumberg testified to the importance of the non-psychiatric hospitalization regarding his opinions. Id. at 25-28.

## Trial Counsels' Failure to Use Available Mental Health Professionals

Trial Counsels' penalty phase presentation was disjointed, scattered and particularly ineffectual in its failure to synthesize readily available life history evidence of mental illness, family dysfunction and physical and sexual abuse into a coherent and persuasive case in support of mitigation. The penalty phase presentation could be described as much too little and much too late.

The evidence presented during the PCRA hearing further establishes two mental health professionals were available and informed Trial Counsel of their possible ability to provide evidence in support of mitigating factors during the penalty phase.

Dr. Berger and Ned Delaney were available to accomplish that task. However, Trial Counsel inexplicably failed to present these witnesses. Bardo's legal representation in this respect is, to say the least, troubling.

In or around December 1992, Trial Counsel retained Dr. Berger to evaluate Bardo. See, N.T. PCRA at 519. Dr. Berger testified during the PCRA hearing he was asked to focus on culpability issues and that penalty phase issues were "[c]learly not the focus." Id. at 520, 522. On December 24, 1992, less than a month before the start of trial, Trial Counsel provided Dr. Berger with certain records. Id. at 520-21. These records did not include all the records which were obtained by PCRA Counsel but available to Trial Counsel in 1992 and 1993, with the exercise of due diligence.

On January 12, 1993, Dr. Berger wrote Trial Counsel that, after reviewing the documents produced on December 24, 1992, and interviewing Bardo, "I feel I may be able to assist you should this case go to the sentencing phase." See, Letter from Dr. Matthew Berger to Joseph Yeager of 1/13/93 (Pet. Ex. 35); See also, N.T. PCRA at 520. Because penalty phase mitigation had not been the "focus" of his initial interview, Id. at 522, Dr. Berger informed Trial Counsel he would need to conduct another interview. Id.; See also id. at 412-23; Note from Gino Bartolai to Joseph Yeager (Com. Ex. 10), Trial Counsel, again inexplicably, failed to make the necessary arrangements for Dr. Berger to see Bardo with a focus on potential avenues of mitigation. Id. at 522-23.

Similarly, Mr. Delaney was not called as a witness during the mitigation phase of the trial. Mr. Delaney advised Trial Counsel in his psychological evaluation of 1/27/93 that "The defendant's initiation into a pattern of drug and alcohol abuse began at the age of 11 and since that time the defendant gave a history of abusing marijuana, glue, wood stain and alcohol. It should be noted that his current drug of choice is beer. . . .It

also should be noted that psychological testing completed in 1988 also revealed a propensity in attitude, behavior, and psychological makeup which would be concomitant with factors contributing to drug and alcohol abuse behaviors. . . .As such, it is my opinion that the history and current behavior of the defendant is consistent with the diagnostic criteria established to determine alcohol abuse." Psychological Evaluation of 1/27/93 (Pet. Ex. 30). See also, N.T. PCRA at 273-77. During the PCRA Hearing, Trial Counsel testified that it would be fair to assume they read Mr. Delaney's report. Id. at 477. However, Mr. Delaney was not called as a witness and Trial Counsel posited no strategic or tactical reason for failing to do so. Id.

## Each of the Aforesaid Failures of Trial Counsel Possesses Arguable Merit

Based on the above-described evidence, this Court concludes that Bardo's claim of Trial Counsel ineffectiveness in failing to present the aforesaid mental health mitigation evidence has arguable merit. The Supreme Court's opinion in Com. v. Martin, 607 Pa. 165, 5 A.3d 177 (Pa. 2010) is most instructive on this issue, as the facts of the instant matter are strikingly similar to those considered in Martin.

Martin upheld the PCRA Court's determination that Trial Counsel was ineffective during the penalty phase as well as its order directing a new sentencing hearing. Specifically, "[a]t the penalty hearing, the defense relied upon two mitigating factors, namely, the age of the defendant at the time of the incident (twenty-one), id. at Sec. 9711(e)(4), and any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense ("the catchall mitigator"). Id. at Sec. 9711(e)(8)" Id. at 198-98. In support of these statutory factors, Trial Counsel presented only the defendant's mother.

At the PCRA proceeding, Martin presented the mental health mitigating evidence he contended Trial Counsel overlooked, i.e. two (2) mental health experts who had treated Martin for years and whose records were available at the time of trial and confirmed Martin's mental health diagnosis and extensive treatment. Id. at 198. The third expert evaluated Martin after the murders, concurred with previous diagnoses, and opined that the same supported the statutory mitigating circumstance set forth at 42 Pa. C.S. Sec. 9711(e)(2). Id. at 199.

The Supreme Court upheld the PCRA Court's determination that this issue had arguable merit. The Opinion provides: "To the extent the PCRA Court's conclusion of arguable merit was based upon factual determinations, we find that there was record evidence to support it. Likewise, we agree with the PCRA Court's legal conclusion that the claim of trial counsel ineffectiveness possessed arguable merit as the evidence ignored was available to trial counsel at the time of the penalty hearing, and would have supported two statutory mitigating circumstances that were not asserted by the defense." Id.

At the very least, the evidence presented during the PCRA hearing established there was mental health evidence found in records contained in Trial Counsels' file and/or in readily available records at the time of trial. This evidence is described above and supported the multiple mental health diagnoses. This evidence and associated diagnoses would have supported . . . the extreme disturbance statutory mitigating factor under 42 Pa. C.S. Sec. 9711(e)(2). This evidence and/or diagnoses was not presented at the penalty phase even though Dr. Berger advised Trial Counsel he could assist in the penalty phase, and Mr. Delaney offered a report outlining several diagnoses and/or factual underpinning of the same supporting a mitigating factor.

Accordingly, we find that that Bardo's ineffectiveness claim has arguable merit.

### Trial Counsels' Failures Had No Reasonable Strategic or Tactical Basis

There is no question that adversarial choices made after less than a complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. See Com. v. Malloy, 856 A.2d 767, 788.

Trial Counsel, Joseph Yeager (Lead Counsel), Gino A. Bartolai, Jr. (Second Chair Counsel) and William Ruzzo (Pro Hac Vice Counsel), were each called and testified at the PCRA hearing. At the time of this case Second Chair Counsel was an Assistant Public Defender for less then two years, and this was his initial homicide trial. See N.T. PCRA at 330-331. He had no specific training in capital litigation, and to that point his knowledge concerning capital mitigation was limited to informal meetings with attorneys in the Public Defender's Office. Id. at 331-332. Despite Mr. Bartolai's obvious inexperience in this regard, Lead Counsel inexplicably delegated to him primary responsibility for preparation and presentation of the penalty phase, and he thereafter provided little supervision. Id. at 332-333, 484. Indeed, Lead Counsel testified: "I have no tactical, nor do I have any excuse for not having the discussions which obviously should have occurred and, once again, that is my negligence and my fault that I did not see that they did occur. I should have been watching over [Second Chair Counsel] more closely." Id. at 490.

Lead Counsel agreed he did not consider utilizing Mr. Delaney as a penalty phase witness but should have done so based on the report. Id. at 477, 482-83. He additionally admitted the defense team had no strategic or tactical reason for not calling Dr. Berger as a penalty phase witness. Id. at 490. Lead Counsel also acknowledged both the absence of a tactical reason for failing to present evidence of Bardo's depression and personality disorder and the efficacy of presenting contemporaneous medical records. Id. at 491-93. Pro Hac Vice Counsel agreed with Lead Counsels' assessment. He stated there was no tactical or strategic reason for the Defense's

failures in this case, including the failure to present mental health evidence to the sentencing jury. Id. at 433, 443, 445, 449-50.

The only explanation for the decision not to call Dr. Berger during the penalty phase was offered by Atty. Bartolai, who suggested Dr. Berger "really didn't . . . have much to say" and "there wasn't much" he could offer. Id. at 378-79. However, as noted above, on January 12, 1993, Dr. Berger wrote Trial Counsel indicating, after reviewing the documents produced on December 24, 1992, and interviewing Bardo, "I feel I may be able to assist you should this case go to the sentencing phase." See, Letter from Dr. Matthew Berger to Joseph Yeager of 1/13/93 (Pet. Ex. 35); See also, N.T. PCRA at 520. Because penalty phase mitigation had not been the "focus" of his initial interview of Mr. Bardo, id. at 522, Dr. Berger informed Trial Counsel an additional interview was necessary. Id.; See also id. at 412-23; Note from Gino Bartolai to Joseph Yeager (Com. Ex. 10). Trial Counsel failed to arrange for Dr. Berger to see Bardo and explore potential avenues of mitigation. Id. at 522-23. This lack of investigation is neither strategic nor reasonable. Rather, the absolute failure of Trial Counsel to pursue Dr. Berger's suggestion he may be able to provide assistance is itself unreasonable pursuant to Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed. 2d 471 (2003). See also, Porter v. McCollum, ___ U.S. ___, ___, 130 S.Ct. 447, 453, 175 L.Ed.2d 398 (2009) (per curiam)(holding that defense Counsels' decision not to investigate mitigating evidence "did not reflect reasonable professional judgment," where counsel had "not even take[n] the first step of interviewing witnesses or requesting records[,] … ignored pertinent avenues for investigation of which he should have been aware, … and thus failed to uncover and present any evidence of [the petitioner's] mental health or mental impairment, his family background, or his military service").

**Prejudice**

This Court has had the opportunity to see and hear the witnesses presented at both the penalty phase and the PCRA hearing. We have completed a review and comparison of the records of both proceedings. Based upon that review and comparison, we are satisfied and find that the legal representation provided to Bardo during the penalty phase of this capital trial was for all the reasons cited herein constitutionally deficient.

The Commonwealth contends that the testimony presented at the PCRA hearing constitutes nothing more than "additional evidence", and as such the claim of prejudice fails under the holdings of Com. v. Rios, 920 A.2d 790 (2007) and Com. v. Marshall, 813 A.2d 539, 549 (2007). The cited cases hold that an "appellant fails to establish prejudice in connection with an ineffectiveness claim based on counsel's failure to investigate and present additional evidence in support of a finding of mitigating circumstances when that mitigating circumstances were already found to exist without

the benefit of additional evidence." We are not persuaded, however, that the cited principle is or should be applicable to or dispositive of the issue of prejudice in this case.

The evidence presented in the PCRA hearing contained much more than additional evidence. We understand and appreciate that one is not entitled to a new sentencing hearing because of the post-trial discovery of a few items of additional evidence or testimony. However, evidence presented in this PCRA hearing contained for the first time expert testimony and volumes of corroborating records. It is true that some of the evidence pertains to mitigating circumstances already found by the jury, but for all practical and legal purposes, considering the nature and quantity and quality of the evidence, this appears as an entirely new presentation.

In the penalty hearing, six jurors found no mitigating circumstances, while six jurors found some or all of the five mitigating circumstances found by the jury, i.e. only two found alcohol abuse. Bardo's defense Counsel at the penalty hearing presented no expert testimony, and accordingly, the applicability of the statutory mitigators: (1) "the defendant was under the influence of extreme mental or emotional disturbance" (42 Pa. C.S.A. Sec. 9711(e)(2) or (2) "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired" (42 Pa. C.S.A. Sec. 9711(e)(3)) was not submitted, as such, to the jury.

PCRA Counsel contends that the expert testimony presented by Blumberg and Berger was in and of itself more than sufficient to submit the (e)(2) and (e)(3) mitigators to the jury for their consideration. The Commonwealth contends that under the facts and the law the (e)(3) mitigator was not appropriate. . . . Even if the Commonwealth is correct that the evidence was not sufficient to warrant submission of the (e)(3) mitigator to the jury, the very same evidence could and should have been presented for consideration under the catchall (e)(8) mitigator.

There is no question that the jury unanimously agreed on the record presented to them that the aggravating circumstances outweighed the mitigating circumstances. On the basis of the evidence they saw and heard, we have neither right nor inclination to disturb that finding. The question is not what did they do, but rather what would one or more of the jurors have done if they saw the witnesses and heard the evidence this Court did in the PCRA hearing.

What we believe and hold is that the record presented at the PCRA hearing is significantly different in nature, quality and quantity than that presented to and heard by the jury at the penalty phase of the proceeding. The picture presented to the death penalty jury and that submitted to this Court in the PCRA hearing are as different as night and day. The picture painted at the PCRA hearing presented a far different and

more illuminating picture of the mitigating circumstances than that presented to and found by the trial jury.

This Court is obviously unable to state with certainty what any juror would do if they heard the PCRA presentation, nor can we say it is highly improbable or even improbable that any juror would have considered this evidence to be sufficiently significant such that, hearing the testimony, it would have imposed a life sentence. Determining the weight of any evidence is not easy. Sometimes critical evidence is reluctantly accepted when it is presented through the accused or his family and friends.

Evidentiary presentations by such witnesses are more readily accepted, credited and weighted when they are presented by credible professionals and/or from corroborating documentary evidence, like Children and Youth's, hospital and school records. The question of weight sometimes turns or depends upon the slightest inclinations of scale. Even the smallest feather of additional evidence may be indeed sufficient to tip the scale. As we sit in judgment and review and compare the trial and PCRA records and see what was and what could have and should have been presented, we can say that this Court has had its confidence in the verdict shaken. When, as the weighmaster, this Court places the credible evidence of the Commonwealth on one side of the scale and the credible and persuasive evidence of the PCRA hearing on the other, our scale tips in favor of Bardo.

We are satisfied and hold that there is a reasonable probability that had the PCRA evidence been introduced at the penalty phase of Bardo's capital murder trial, one or more jurors were reasonably likely to have found additional mitigating circumstances and that those mitigating circumstances outweighed the aggravating circumstances. We therefore find the predicate prejudice has been established.

*　　　*　　　*

## Conclusion

We do not hold nor should our decision be construed to mean that the death penalty is not appropriate or should not be imposed in this case. All we hold is that before the ultimate penalty is imposed in any capital trial, the sentencing jury should have the right and opportunity to hear all of the available evidence before deciding the presence and weight of any aggravating or mitigating circumstances. Only then can a jury properly employ the scales of justice fairly and correctly determine which side outweighs the other. It may well be that even after hearing all of the PCRA testimony, the jury will find that the aggravating circumstances of the case still outweigh the mitigating circumstances. Whatever happens, at least we will know the decision was based on all the available evidence and not a truncated record. What we find and declare is Trial Counsels' stewardship during the penalty phase of the trial was

constitutionally deficient, and accordingly, we vacate the sentence of death and grant a new sentencing hearing.